Tucker, P.
The difficulty which was supposed to
exist as to the jurisdiction in this case, disappears when we look to the position of the parties. Kevan, the appointed guardian of young Myrick, was summoned, at Waller’s instance, to shew cause why he should not be removed, he Waller claiming that he had been appointed testamentary guardian, and not having been summoned or notified according to law, to declare'his acceptance or renunciation of the office. Kevan was removed .by the Hustings Court of Peters-burg by which he had been appointed. Waller then moved to be permitted to qualify; Kevan opposed this motion; and it was entered of record that he did so. The Hustings Court rejected Waller’s motion; and Waller appealed. How although, if the two cases are considered as distinct, Kevan’s right of appeal might have created some doubt, if he had failed in the Hustings Court; yet as he succeeded, and Waller appealed, Kevan was properly before the Circuit Superior Court as a party; and as that court reversed the sentence of the Hustings Court, and gave judgment against him for costs, there can be no doubt, I think, of his right of appeal from that judgment. The question is then fairly brought up as to the merits of the sentence.
I put out of the case all question as to the power of one of two testamentary guardians to qualify without *445 the other. I take it to be clearly and properly settled, under the statute concerning testamentary guardians,1 that the authority conferred is joint and several; that it is not a naked authority, hut coupled with an interest; that if one dies, it will go to the survivor; that where one refuses, the other may qualify without him; that each is a complete guardian, if the other does not qualify. It would he most mischievous if, where there are several appointed, and some refuse to act, the rest should not be able to do any thing; and yet this must he the consequence, if the appointment of several should he held to be one joint naked authority; a construction which would make the act of little force, and the more guardians a father should appoint for the security of his child, the less secure he would be, since the refusal of one would defeat the authority of all. 2 P. Wms. 102, 107-8.
The real question in the case is, whether the will of Myrick constituted Waller and Clarke the guardians of his child? And here I shall concede, that it has been decided (whether wisely or not, may perhaps he questionable) that the use of the term guardian, or other express words of appointment, is not necessary, nor is it material by what words the guardian is appointed, provided the father’s intent be sufficiently apparent. Yet, with this concession, I am still of opinion, that, as the father’s authority is an innovation upon the common law, and in derogation of the rights of the mother or other kindred who would be entitled to he guardians by nature, the declaration of his intention should he distinct and unequivocal, and in terms inconsistent with the existence of the power and authority of the natural guardian. And if the language of his will is clearly reconeileable with the rights of such natural guardian, it should not he strained, by piling inference upon inference, so as to take them away. Thus, in the present case, the mother *446 if alive, or the grandfather if she he dead, are the guar¿qang ]3y nature of this child. From the tie of blood, the law looks upon them as his natural protectors. But as the father may be presumed to know to whom it would be safest to entrust him, the law defers to his judgment; yet it surely will not be eager to presume that the father intended to tear his child from the tender cares of a mother, or other kindred, and to place his person, his fortunes and his education, in the hands of a stranger. Before we arrive at such a conclusion, the language must be clear and cogent; and moreover, the direction given to the stranger must be incompatible with the guardianship in the next of kin, or it cannot fairly be presumed to be designed to take it away. For if the intent can be fully satisfied short of annihilating the natural guardian’s power, we are not authorized to go one step farther.
Such appears to me to be the present case. Here is a grandfather of the child yet living. Why should we presume, that the father intended to take from the grandfather, his natural friend and protector, this only child, and place his person and all his property, in the hands of Waller and the grandfather jointly? Because he has ordered, that he shall be “educated in the best manner, under the direction of his executors ? ” Is this order incompatible with the rights of the natural guardian? What -more was meant, than that Waller and Clarke should prescribe the course, and point out the mode, of his education, to the person having the guardianship ? Such directions that person would indeed be bound to follow: because, even before the statute, the father had the power of directing the course of his child’s education, and a court of equity would enforce a compliance with his will. Since the statute, it is yet more clear; the greater power of appointing a guardian, comprehending that of directing the education, or giving power to direct it. Accordingly, in *447 the case of Beaufort v. Berty, where the testator appointed two guardians, and recommended that should take the advice of the Duke of Ormond, as to the education of the wards, Lord Macclesfield recognized the validity of this recommendation, hut the Duke of Ormond being attainted, the authority was held to devolve upon the great seal, and the chancellor thereupon directed that the guardians should take the advice, and follow the counsel, of the Duke and Duchess of Grafton, who were relations of the wards. Here, then, the guardianship was in two persons, and the “direction of the education,” in two others. And is any thing more common, than for a father, who is solicitous about his child’s education, to declare his wishes that some friend, in whom he has confidence, should have the direction of his education, without designing to burden him with the guardianship, the custody of his person, and the management of his fortunes ? Such a construction would defeat its very object; for a friend might be very willing to discharge the duty of an adviser or director of the child’s education, who would be unwilling or unable to take upon himself the guardianship. That great and excellent man, our former fellow labourer, and one of the lights and ornaments of this court, (the late Judge Carr,) recommended that his son should be educated under the direction of myself, in conjunction with his wife. It may be safely affirmed, that he never designed take the guardianship of his boy from that excellent lady, or to vest in me any power over his person or his estate.' Certain it is, I never dreamed of such a construction of his will, whilst I should have faithfully complied, as far as I was able, with his wishes. should never have supposed it necessary to enter into bond, with security, before I could have recommended a course of study or instruction, nor should I have thought myself entitled to qualify as a guardian, *448 take the child and his estate from his mother’s hands, case she did not qualify also. I have mentioned this ease merely as furnishing an actual instance of a provision similar to that at bar, in which the construction contended for by the appellee, would obviously have violated the wishes of the testator.
From what has been said, I think it clear, that an authority to direct the education of a child, may be exercised by one, while the guardianship (that is, the custody of his person and property,) may be in another. The two things, then, are not incompatible, and if not incompatible, the gift of the former is no derogation of the latter. To me, indeed, it appears that the very provision, that a child shall be educated under the direction of an individual, implies the custody by one person, and the direction of the education by another. Had the testator in this case designed to confer the guardianship, he would have conferred it totidem verbis, since it would have been the most natural and obvious mode of expressing himself; or had he designed that his child’s education should be directly conducted by the executors, he would have said that he should be educated by them; but, in declaring that he should be educated under their direction, there is the strongest implication of agency in some other,- who was to be subject to their direction. That other was-the guardian. The clause in question is indeed imperfect.: he gives his son 15,000 dollars, “and from the proceeds to educate him.” Here is something’ wanting, something to be supplied, but what, is not so clear. Yet it is clear, that the words “my executors,” are not the omitted words, for if they are inserted it will make the sentence absurd. It will make the testator provide that his executors shall educate' him, under the direction of his executors. Either the testator intended some other person, or he intended to speak impersonally; and, in- either case, he seems- *449 to have looked to his child’s education being conducted by others, though under the direction of executors.
The statute concerning guardians, &c., and the interpretation of the word tuition there used, were the subject of much discussion at the bar. That word I certainly do not understand in the narrow sense of instruction or education; it is used in the broader sense of' protection, superintendence, guardianship; it comes from the Latin tueor, to defend; and hence its radical signification is defence. This is also implied by the word guardianship; which, however, is yet broader, for it implies custody; its root is the Anglo-Saxon wardian; which signifies to look, to look after, and thence by transition, to guard, to keep; and so implies custody. The-word guardian is derived immediately from the French. gardien, which itself comes from wardian; the w being; converted, as is usual, into g. Richardson’s Diet. 1 Toolce’s diversions ofPurley, 332-4, 2,Inst.., 305. Thus,, guardianship includes the idea of custody; and custody and tuition, as used in the statute, constitute guardianship„.
Admitting, therefore, that no particular words are-necessary in a will for the appointment of a testamentary guardian, it may safely be affirmed, that the language must be such as to imply a right to the custody, control, and protection of the ward. This I do not think can be fairly implied from the provision, that the child shall be educated under the direction of the executors.
The word education, here, is obviously used in the narrow sense of instruction, and does not imply tuition, and much less custody. But it is contended, that we must infer a right of control over the education, from the right of direction; a right to the possession of the person from such right of control; and the powers of a guardian over the estate from the right to the possession of the person; and thus, from the simple power *450 to direct the course of education or instruction, the appeqee eiaims f0 ]je invested with the custody of person and estate, and a guardian’s power over both. I cann°t consent thus to build inference upon inference, of which I am persuaded the testator never dreamed. I must have somewhat more than a single case, and ■that too of doubtful authority and analogy, before I will pile consequence upon consequence, for the purpose of vesting in a party the largest powers over the person and estate of an orphan from so remote an implication.
If indeed we look to authority, I think the case of the appellee.will not be much better than without it. The case of Lady Teynham v. Lennard stands alone, and may well be suspected to have been partly decided under the influence of religious jealousy and intolerance. It occurred in the very heat of sectarian controversy, early in the reign of George I. and turned on the dangers of entrusting the education of a child to a Papist mother. It was, moreover, stronger than this case; for there were in that case words of exclusion of the natural guardian; the testator said, he “expected his father to take care of the education of his child in the Protestant religion, and not leave the education of it to Ms wife.” Against this case may fairly be opposed the case stated in Bedell v. Constable, where even a devise of land to J. S. during the minority of the testator’s child, for his maintenance and education, was held not to constitute him guardian.
This view of the case renders it unnecessary to en-quire, whether the evidence adduced to shew Waller’s unfitness for the office, would have justified the refusal to permit him to qualify, even if he had been really appointed a testamentary guardian.
Upon the whole, I am of opinion, that the sentence of the Circuit Superior Court be reversed with costs, *451 ■and the sentence of the Hustings Court refusing 'Waller permission to qualify as guardian affirmed.
The other judges concurred.
Sentence reversed.